**AFFIRM; and Opinion Filed November 4, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-14-00428-CR**

**HUGO SILVA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause No. F-1253639-K**

## MEMORANDUM OPINION

Before Chief Justice Wright, Justice Fillmore, and Justice Stoddart
Opinion by Justice Fillmore

A jury convicted Hugo Silva of capital murder, and the trial court assessed punishment of life imprisonment. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1 (West Supp. 2014). Silva's sole complaint on appeal is that the evidence is insufficient to support the conviction for capital murder because the evidence does not prove he had the specific intent to murder the victim. We affirm the trial court's judgment.

### Background

On January 11, 2012, Silva shot Mark Veloz during the commission of a robbery. Veloz died as a result of the gunshot wound.

Dan Town, a detective in the Crime Scene Response Unit of the Dallas Police Department, testified he was called to the scene of the shooting at 3931 Schofield Drive

(Schofield house) on January 11, 2012. The Schofield house appeared to be a "trap house," a house where illicit drugs are sold. Veloz's barefoot body was laying on the floor of the living room between a couch and a coffee table. A nine millimeter shell casing was found when a cushion of the couch a few feet to the right of Veloz's body was turned over.

Forensic pathologist Emily Berry testified regarding the autopsy she performed on Veloz's body. Veloz died from a gunshot wound to the head, and the manner of death was classified as homicide, although Berry could not testify concerning the intent of the person who fired the weapon. The bullet entered behind Veloz's right ear and partially exited above his left eyebrow. Accordingly, the trajectory of the bullet was from back to front, right to left, and slightly upward. The wound was rapidly fatal. There was no soot or muzzle imprint on or around the entry wound. Stippling is typically seen on an entry wound when a gunshot is fired within two and one-half feet of impact. There was no stippling seen on the entry wound. Berry opined that the gun used to shoot Veloz was fired at a distance greater than two and one-half feet from Veloz. Berry stated a firearm is a deadly weapon.

Detective Kevin Whitworth of the Dallas Police Department testified that on December 14, 2011, he assisted with a traffic stop in which the driver of the vehicle, John Villarreal, was arrested. A nine millimeter bullet shell casing was recovered from the passenger compartment of the vehicle Villarreal was driving. Scott Saker, a special agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives, took possession of that shell casing. Saker testified the shell casing was then submitted for ballistics laboratory analysis, and the results of the analysis were entered into the National Integrated Ballistic Information Network (NIBIN), a database in which ballistic information regarding shell casings is compiled for comparison. When the shell casing recovered from the vehicle driven by Villarreal was entered into NIBIN, no match was found to any ballistic information in the database.

Susan Allen of the Dallas Police Department testified she compared the nine millimeter shell casing recovered from the vehicle driven by Villarreal on December 14, 2011 to the nine millimeter shell casing recovered from the scene of the January 11, 2012 shooting of Veloz and determined they were fired from the same gun. Saker testified the NIBIN laboratory requested the nine millimeter shell casing from the January 11, 2012 shooting of Veloz for formal confirmation of the match with database information regarding the nine millimeter shell casing recovered on December 14, 2011.

The markings on those nine millimeter shell casings are consistent with a Glock handgun. Glock primarily manufactures semi- and fully-automatic handguns. Allen testified a Glock handgun will usually eject shell casings to the right. Shell casings can eject anywhere from one to ten feet from the person shooting. Allen did not have the nine millimeter handgun from which the shell casings recovered on December 14, 2011, and January 11, 2012, were fired and was not, therefore, able to test the direction and distance shell casings are ejected from that particular weapon.

Fernando Hernandez testified he and Silva were friends and lived together at Hernandez's father's home for a couple of months in 2011 and in January 2012. Silva and Veloz were also very good friends and were together almost every day. Hernandez had been to the Schofield house once or twice to buy marijuana. Silva went to work with Hernandez the day after the murder and was acting "very strange." He told Hernandez he had received a phone text message informing him that Veloz had been killed, and Silva appeared sincerely sad about the death of his friend. The day of Veloz's funeral, Silva wore a shirt with Veloz's picture on it, and Silva told Hernandez he had gone to Veloz's funeral "for a little while."

Fernando Hernandez testified a detective came to see him about the nine millimeter shell casing found in Villarreal's vehicle. Hernandez told the detective that he, his cousin, and Silva used Villarreal's vehicle prior to December 14, 2011. Hernandez had seen Silva in possession of a nine millimeter Glock handgun, and Hernandez had purchased that handgun from Silva about a month before the January 11, 2012 shooting of Veloz. Hernandez testified he kept the Glock handgun beside his bed.

Hernandez recalls Silva telling him what he had done on January 11, 2012, at the Schofield house. Silva had gone to that house the evening of January 11, 2012, and then returned to the house a second time later that night. When he returned from the second trip to the Schofield house, Silva brought a "sewing case full" of drugs (baggies containing cocaine and marijuana and a couple of ounces of methamphetamine) and money. Silva told Hernandez he "hit a lick," meaning he had stolen the drugs and money from the Schofield house.

Silva told Hernandez that no one had seen him at the Schofield house the second time he was there and that Veloz was asleep. Hernandez testified Silva told him that "whenever [Silva] seen [sic] – I guess when [Silva] was leaving, [Silva] seen [sic] [Veloz] waking up, and [Silva] said he pun – he punched [Veloz] and knocked him out." Silva had taken Hernandez's gun with him to the Schofield house, and Hernandez repeatedly asked Silva where his nine millimeter Glock was, but Silva did not want to tell him. Silva eventually told Hernandez he had "got[ten] rid of it." Silva asked Hernandez to sell the methamphetamine, which Hernandez did, and gave the money derived from the sale of the methamphetamine to Silva. Silva went shopping for sneakers and clothes after Hernandez gave him the money from the sale of the methamphetamine.

–4–

At some point after Veloz was killed, Hernandez asked Silva to leave his house. A few weeks after Silva left Hernandez's house, Hernandez was in contact with Silva, who was then working in Louisiana.

Brian Tabor, a detective in the homicide division of the Dallas Police Department, was the lead detective investigating Veloz's death. Tabor testified the Schofield house was characteristic of a "trap house." A nine millimeter shell casing was found under a couch cushion after the cushions had been removed during the crime scene investigation. Tabor testified that shell casings are ejected to the right from most handguns. Tabor believed the nine millimeter weapon was fired in the vicinity of the nearby dining room or around the couch.

Tabor testified the shell casing recovered from the Schofield house matched a shell casing found in an unrelated traffic stop. Investigation of the shell casings led to Hernandez and then to Silva. After Hernandez was interviewed, investigation of the shooting of Veloz focused on Silva. A warrant for Silva's arrest was obtained, and federal agents located and arrested Silva in Louisiana. After Silva's arrest, Tabor and his partner drove to Louisiana to interview him. Silva told Tabor he had ingested cocaine and "bars" the night of January 11, 2012, and he was paranoid, although Silva appeared to Tabor to be a generally paranoid person, believing a number of people meant to harm him. Silva told Tabor he had gone to the Schofield house to "hit a lick," meaning to commit robbery; Silva intended to steal "Gilbert's stuff" consisting of drugs and guns. Silva was upset with Gilbert, who ran the trap house, because he would no longer allow Silva to sell drugs from that location, and Silva believed Gilbert owed him money. By "hitting a lick" at the house, Silva was "hitting Gilbert." Silva told Tabor that Veloz was involved in the robbery of the Scofield house and that Veloz was going to allow Silva to walk in and take everything from the house. Silva stated Veloz did not try to stop him from stealing items from the Schofield house that night. Silva took Gilbert's guns and drugs from the

–5–

Schofield house; he stated there were other things in the house he could have taken, but he did not have time to steal them. Silva admitted to Tabor that he shot Veloz and that he used a nine millimeter weapon. Silva told Tabor that he heard a clicking sound he believed to be the cocking of a gun, and he wanted to fire his weapon before he was shot. Silva had gotten rid of the nine millimeter weapon used to shoot Veloz.

Excerpts of the audio recording of Tabor's interview of Silva were played for the jury.[1] In that interview, Silva told Tabor that Veloz's cousin, Gilbert, operated the "trap house" on Schofield Drive. Although he was not permitted to sell drugs from that trap house any longer, Silva would go there and "kick it" with his "homeboys." Silva went to the Schofield house on January 11, 2012, between 11:00 and 11:30 p.m.; there, he bought and snorted cocaine. He left the "trap house" at about midnight and went to Hernandez's house.

Silva returned to the Schofield house between 12:30 and 1:00 a.m. He went there to steal Gilbert's property because Gilbert owed him money. Veloz was going to permit Silva to steal Gilbert's property because he was aware Gilbert owed money to Silva. Silva took a shotgun and a forty-five caliber gun, marijuana, methamphetamine, and cocaine from the Schofield house. It took him less than five minutes to steal these items. With regard to how Veloz was shot at the Schofield house, Silva stated Veloz did not attempt to stop him, but when he was walking to the back of the house to where larger quantities of drugs were kept, he heard what he believed was a sound like a gun being cocked to fire. Silva said his gun was already cocked to fire and "I ain't trying to get shot."

Silva then returned to Hernandez's house and told Hernandez he had "hit that lick" at the Schofield house. Silva denied Hernandez asked him what he had done with the nine millimeter

---

[1] For demonstrative purposes only, a transcription of Tabor's interview of Silva was furnished to the jury in conjunction with the playing of the audio recording of that interview.

Glock handgun previously sold to Hernandez. Silva told Tabor the gun he used during the robbery was "sent" to Mexico by his cousin. Silva sold the methamphetamine he stole from the Schofield house to Hernandez.

Marcus Markulec, a detective in the Dallas Police Department assigned to a Federal Bureau of Investigation gang task force, testified he interviewed Silva in Louisiana after Silva's arrest. Investigation of the homicide of Veloz was not Markulec's main reason for interviewing Silva. According to Markulec, Silva provided a great quantity of information regarding individuals involved in sale of narcotics in Dallas, and Silva was cooperative, honest and trustworthy with regard to the information he provided pertaining to those matters.

Markulec testified Silva told him that he had snorted cocaine and "got lit," or was basically intoxicated the night he robbed the Schofield house. According to Silva, he and Veloz had agreed beforehand that Silva would break into the house and steal certain things. When Silva arrived, Veloz was sleeping. Silva placed drugs, guns, and money in a pillowcase. Silva stated he was going to a back room in the house when he heard Veloz saying something to him and a sound like the "racking" or cocking of a semi-automatic weapon. Silva stated "I just turned around, and I fucking shot [Veloz]." After shooting Veloz, Silva placed more drugs in the pillowcase.

The audio recording of excerpts of Markulec's interview of Silva was played for the jury.[2] In that interview, Silva stated that the night of January 11, 2012, he knew there was methamphetamine with a value of $5,000 at the Schofield house, and Gilbert owed him $400 or $500. Silva went to the Schofield house and snorted cocaine. After leaving the Schofield house, he then called Veloz and discussed robbing the Schofield house. When Silva arrived at the

---

[2] A transcription of Markulec's interview of Silva was furnished to the jury in conjunction with the playing of the audio recording of that interview.

Schofield house for the second time, Veloz only wanted Silva to steal items Veloz "didn't have his money into." Silva placed cocaine, marijuana, and some methamphetamine, a forty-five caliber handgun, a shotgun, and $800 in a pillowcase. When Silva began to walk to a back room where he knew methamphetamine valued at $5,000 was located, he heard a sound like the "racking" of a gun. Veloz was saying, "You know [Gilbert's] gonna find out it was you," and "I'm gonna snitch on you." As Silva turned around, Veloz was "like getting up," and "That's when I just . . . I just turned around and I fucking shot him" with a nine millimeter Glock handgun. The bullet hit Veloz in the head. Silva said he "wasn't really aiming. I was just like . . . I was trying to scare him." Silva then took the methamphetamine from the back room and placed it in the pillowcase. Silva checked to see if Veloz was breathing, but he was not. Silva walked to a vehicle that belonged to Hernandez which he had driven to the Schofield house and drove to Hernandez's house. Silva sold methamphetamine, marijuana, and cocaine he had stolen from the Schofield house to Hernandez. Silva stated he sold the stolen guns to his cousin.

The jury found Silva guilty of capital murder, and the trial court sentenced Silva to life imprisonment. Silva filed this appeal.

## Sufficiency of the Evidence

In his only point of error on appeal, Silva contends the evidence is insufficient to support his conviction for capital murder because the evidence does not prove he had the specific intent to murder the victim. Silva argues the evidence presented "only proves" he committed the offense of felony murder.

### Standard of Review

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any

–8–

rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The factfinder is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the factfinder's determinations of credibility, and may not substitute our judgment for that of the factfinder. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court may not re-weigh the evidence and substitute its judgment for that of the factfinder). When there is conflicting evidence, we must presume the factfinder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903.

In our sufficiency review, "direct evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and the factfinder is permitted to make reasonable inferences from the evidence presented at trial. *Id*. at 13–14. "Circumstantial evidence alone can be sufficient to establish guilt." *Id*. at 15. "Each fact need not point directly

and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (quoting *Hooper*, 214 S.W.3d at 13).

*Analysis*

Under section 19.02(b)(1) of the penal code, a person commits murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Section 19.03(a)(2) of the penal code provides that a person commits the offense of capital murder if the person commits murder, as defined under section 19.02(b)(1) of the penal code, and "the person intentionally commits the murder in the course of committing or attempting to commit" robbery. *Id.* § 19.03(a)(2) (West Supp. 2014); *see also Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (capital murder includes an intentional murder committed in the course of robbery); *Demouchette v. State*, 731 S.W.2d 75, 80 (Tex. Crim. App. 1986) ("phrase 'intentionally commits the murder' in Sec. 19.03(a)(2) makes 'intentional' (Sec. 6.03(a)) the culpable mental state necessary for conviction of capital murder under 19.03(a)(2)").[3]

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Intentional murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "That is, the accused must have

---

[3] The penal code contains the following with regard to the elements of robbery:

A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he:
(1) intentionally, knowingly, or recklessly causes bodily injury to another; or
(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

TEX. PENAL CODE ANN. § 29.02(a) (West 2011).

–10–

intended the result, death, or have been aware that his conduct was reasonably certain to cause that result." *Guzman v. State*, 20 S.W.3d 237, 240 (Tex. App.—Dallas 2000), *rev'd on other grounds*, 85 S.W.3d 242 (Tex. Crim. App. 2002).

A requisite culpable mental state is almost always proved by circumstantial evidence. *Stobaugh v. State*, 421 S.W.3d 787, 862 (Tex. App.—Fort Worth 2014), *pet. ref'd*, 455 S.W.3d 165 (Tex. Crim. App. 2015). A jury may infer the intent to kill from the defendant's acts, words, or conduct, *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967) (quoting *Kincaid v. State*, 150 Tex. Crim. 45, 198 S.W.2d 899, 900 (Tex. Crim. App. 1946)), and from any facts in evidence it believes "proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003); *see also Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (if deadly weapon used in deadly manner, inference is "almost conclusive" that defendant intended to kill) (quoting *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986)). If the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and defer to that determination. *See Jackson*, 443 U.S. at 326. The specific intent to kill may be inferred from the use of a deadly weapon, unless the manner of its use makes it reasonably apparent that death or serious bodily injury could not have resulted. *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. 1984) (op. on reh'g); *see also* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West Supp. 2014) ("deadly weapon" means "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury"). "Naturally, the most obvious cases and the easiest ones in which to prove a specific intent to kill, are those cases in which a firearm was used and was fired or attempted to have been fired at a person." *Godsey*, 719 S.W.2d at 581. If a deadly weapon, such as a pistol, is used in a deadly manner, an intent to kill is presumed. *Livingston v. State*, 739 S.W.2d 311, 337 (Tex. Crim. App. 1987); *see also Adanandus*, 866

–11–

S.W.2d at 215 (intent to kill may be inferred from use of a deadly weapon in a deadly manner); *Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981) ("In fact, where a deadly weapon is fired at close range and death results the law presumes an intent to kill."); *Thompson v. State*, 521 S.W.2d 621, 622 (Tex. Crim. App. 1974) (pistol is a weapon deadly per se when fired at a victim at close range).

With these principles in mind, we turn to the record to determine whether the evidence is sufficient for the jury to have found beyond a reasonable doubt that Silva intentionally caused Veloz's death. Silva took the nine millimeter Glock handgun he had previously sold to Hernandez with him to commit the offense of robbery at the Schofield house. The jury heard Silva state in his interview that Veloz was asleep and awoke while he was committing the robbery. Veloz was shot in the head from behind. Veloz's barefoot body was laying facedown adjacent to a couch where a shell casing, fired from the gun Silva used, was found during the crime scene investigation. In his interview, Silva stated Veloz said he was going to "snitch" on Silva and stated he "turned around" and "fucking shot [Veloz]." Considering the evidence, the jury could reasonably infer Silva acted with the required mental state at the time of the shooting. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (stating jury may infer intent to kill from use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from use of weapon).[4]

*Conclusion*

After reviewing the evidence under the appropriate standard, we conclude a rational trier of fact could have found beyond a reasonable doubt that Silva intentionally caused Veloz's

---

[4] *See Hogg v. State*, No. 05-10-00231-CR, 2011 WL 2685968, at *4 (Tex. App.—Dallas July 12, 2011, pet. ref'd) (not designated for publication).

death.   We resolve Silva's sole point of error against him, and we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

140428F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

HUGO SILVA, Appellant

No. 05-14-00428-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4, Dallas County, Texas,
Trial Court Cause No. F-1253639-K.
Opinion delivered by Justice Fillmore, Chief Justice Wright and Justice Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 4th day of November, 2015.